IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

_____

UNITED STATES OF AMERICA,

                            Plaintiff,

      v.

DIOGENES A. DIONISIO,

                            Defendant.

REPORT AND
RECOMMENDATION

04-cr-30-bbc

_____

**REPORT**

Defendant Diogenes A. Dionisio is citizen of the Republic of the Philippines and a practicing physician. In 2004, a grand jury sitting in this district indicted Dr. Dionisio, charging him in a six-page, three count indictment with engaging in a fraud scheme against the government's TRICARE medical insurance program for overseas veterans. The government did not attempt to extradite Dr. Dionisio; instead it sealed its indictment and waited about four years for him to visit Guam, where he was arrested on this court's warrant. Before the court for report and recommendation are Dr. Dionisio' motions to dismiss the charges because of pretrial delay (dkt. 13) and pre-indictment delay (dkt. 14).[1] For the reasons stated below, I am recommending that this court dismiss the indictment due to pretrial delay.

On July 10, 2008, this court held an evidentiary hearing. Having heard and seen the witnesses testify, and having considered the affidavits, exhibits, and other evidence submitted by the parties, I find the following facts:

---

[1] A report and recommendation on the suppression motions and an order on the motion for a bill of particulars are imminent. Because the instant recommendation to dismiss is not binding on the district judge, the other motions are not moot.

## FACTS

Diogenes A. Dionisio was born in Manila, Philippines in 1950 and has been a resident of the Republic of the Philippines his entire life.  Dr. Dionisio graduated from medical school in 1975 and completed his residency in internal medicine in 1983.  In 1988, Dr. Dionisio founded the CDMF Medical Clinic (the Clinic) in Mandaluyong City, Philippines.  Dr. Dionisio has practiced medicine at this clinic ever since.  According to Dr. Dionisio, the Clinic's usual practice is to maintain medical records for five years after a patient's last visit, at which time the records usually would be destroyed.  The Clinic does not maintain its business records beyond five years.  Additionally, Dr. Dionisio reports that some time between 2004 and 2008, a flood destroyed many of the Clinic's medical and business records.

In 1998, the U.S. Department of Defense Criminal Investigative Service (DCIS), with assistance from U.S. postal inspectors and other agents, began investigating possible health care fraud emanating from overseas providers of health care services to retired military personnel and their dependents under the TRICARE program.  Because TRICARE's overseas claims were processed by WPS insurance company in Madison, the United States Attorney's Office for the Western District of Wisconsin (the USAO) assumed responsibility for overseeing the investigation.  DCIS targeted the Philippines as a hot zone due to the number and dollar amount of claims generated there.[2]

---

[2]  Since 1998, 37 individuals and one corporation have been indicted in this district on charges of TRICARE fraud in the Philippines.  The case against Health Visions Corporation and its officers involved over $99 million in alleged fraud against TRICARE.

In April 2000, federal investigators–including Special Agent Daniel Boucek from DCIS, who later took the lead on the Dionisio segment of this investigation–traveled to the Philippines to interview participants in the suspicious TRICARE claims.  Agent Boucek and his colleagues were chary of sharing investigation information with anyone in the Philippines, including Philippine law enforcement agents.  Based on their personal experiences, documents they had read,  official embassy reports addressing Philippine corruption, unofficial communication with folks from the United States embassy, and conversations they had with local witnesses, the American agents believed that they could not trust anyone on the local side of the equation to maintain the confidentiality of sensitive investigative information.  The agents believed that because official corruption was sufficiently widespread and prevalent in the Philippines, information having value likely would find its way to the affected party.  Because the American agents always were accompanied by Filipino counterparts whose loyalty they questioned, the American agents labored under the constant, self-imposed imperative not to share their information.

By way of example, Agent Boucek reported that a different investigative target was tipped off that agents were interested in him so that by the time the agents arrived in the Philippines, this target already had begun to hide his documents.  As a second example, Agent Boucek reported that after the USAO had indicted a different Philippine physician ("Dr. M" in AUSA Jarosz's affidavit, dkt. 22 at ¶15) in 2002, the U.S. sent an extradition request and a provisional arrest warrant to the Philippine government.  These facts were published immediately in a Philippine newspaper and the target went into hiding and has yet to be found.  *See* Transcript of July 10, 2008 hearing, dkt. 30, at 33-35; dkt. 22 at ¶ 15.  In January 2006, the USAO filed

extradition papers against five Philippine citizens implicated in the TRICARE fraud investigation. (Obviously, Dr. Dionisio was not one of them).  Provisional warrants have not yet issued; apparently, the Philippine government still is reviewing the requests.

As a result of the information available to them, the agents concluded that it was futile to present provisional warrants to the Philippine government seeking the arrest and extradition of Philippine nationals.  The agents believed that somebody at some level would leak the information and that the target would succeed in thwarting arrest and extradition.

Nothing directly relevant to the instant case occurred during the agents' first trip to the Philippines.  Investigators returned in September 2000 to continue their investigation. Following the second trip, investigators began culling and analyzing their evidence, looking at more than 46 people and entities (not including Health Visions Corp.).  Developing the information relevant to health care providers involved thousands of documents and took hundreds of hours.  The process took longer because the assigned agents had time-consuming obligations in their other investigations not related to TRICARE.

In August 2001, investigators returned to the Philippines to develop additional evidence. On August 21, 2001, investigators met with Dr. Dionisio at his medical clinic.  According to Dr. Dionisio, the agents did not advise him that they were conducting a criminal investigation.  No one advised Dr. Dionisio of his *Miranda* rights, or otherwise indicated that he had the right to remain silent.  Dr. Dionisio inferred that the agents were conducting a routine insurance review. According to the agents in their report of this interview, Dr. Dionisio explained that although he always provided some sort of medical service for CHAMPUS patients (the former name of the TRICARE program), he often sent bills to CHAMPUS that reflected procedures not performed or

4

lengthier hospital stays than actually occurred.  Dr. Dionisio explained that he felt justified doing this because he only received payment for about 60% of his CHAMPUS patients, since many checks from the United States got lost in the mail before delivery to him or to his patients.  Dr. Dionisio reported that he normally allowed his CHAMPUS patients to keep 40-60% of the money he received from CHAMPUS because they were poor and needed the money, and the remainder covered his services and expenses.   The agents presented Dr. Dionisio with a spreadsheet of over 600 patients of his for whom he had submitted CHAMPUS claims.   Dr. Dionisio marked with a "✓" those patients who received 80% of the CHAMPUS insurance check for personal use (about 6 names); he marked with an "✗" the patients whom he treated but for whom he never received payment (about nine names); he marked with an "O" the patients on the list that he was not sure he ever treated (about four names).  According to Dr. Dionisio, any name that he did not mark meant that he had treated the patient and the patient had received 40 - 60% of the CHAMPUS payment for personal use.  Dr. Dionisio also explained that he intentionally overstated to CHAMPUS the length of his patients' hospital stays to see how much money he could obtain for the patients.  After "testing the waters" with claims as high as 10 - 15 days, he lowered subsequent claims to 4-5 days of hospitalization.  When asked to provide a sworn statement of his CHAMPUS activities, Dr. Dionisio stated he wanted to consult with an attorney first.  Dr. Dionisio was willing to sign and date the spreadsheet that he had marked. The agents left; Dr. Dionisio remained at his clinic.

Upon returning from the Philippines in August 2001, the investigating agents continued their process of sifting their evidence and putting dozens of cases together for presentation to the USAO, in addition to their other work on other cases.  In November 2003, DCIS presented

its case against Dr. Dionisio to the USAO.  After presentment, DCIS continued to collect documents relevant to the investigation.

On February 19, 2004, a federal grand jury sitting in this district returned an indictment against Dr. Dionisio charging him with health care fraud.  The indictment (dkt. 1) is short and relatively simple.  Count 1 charges a *Klein* conspiracy under 18 U.S.C. § 371 for the period February 12, 1999 to December 19, 2000, alleging a simple kickback scheme on TRICARE payments to patients of Dr. Dionisio.  The alleged scheme is straightforward:  Dr. Dionisio would perform services on a patient but inflate the cost and generate paperwork supporting the request for excess payment.  TRICARE would mail a check either to the patient or Dr. Dionisio and they would split the overage.  Count 1 alleges three brief sets of overt acts arising out of specific claims.  Counts 2 and 3 charge the same overt acts against Dr. Dionisio as false statements in violation of 18 U.S.C. § 287.

The government obtained a warrant for Dr. Dionisio's arrest, then sealed the warrant and the indictment.  No one told Dr. Dionisio that he had been indicted.  In fact, federal agents did not want Dr. Dionisio to know.  The agents knew that the United States had an extradition treaty with the Philippines that applied to Philippine nationals.  The United States government had publicly lauded this extradition treaty as "an extremely important law enforcement and interdiction tool" and stated its belief that the government of the Philippines shared this view "as demonstrated by the close cooperation that exists between our two countries' law enforcement agencies in these cases."  *See* "U.S. - Philippines Cooperation on Law Enforcement," Dec. 19, 2002 Memo of the Embassy of the United States in Manila, attached as Exh. A to the Jarosz affidavit, dkt. 22. The official position of the United States was that "The U.S.-

Philippines extradition treaty is working, both countries are implementing it seriously, and both are benefitting from it."  The only figures provided to the court show that the Philippines and the United States were roughly equivalent in the percentage of extradition requests they have cleared (31% for the Philippines, 39% for the United States).  *See id.*

The TRICARE agents and prosecutors, however, were considerably less sanguine in 2004: they believed that the any attempt extradite Dr. Dionisio would be compromised by the locals. They believed that their only hope of obtaining jurisdiction over Dr. Dionisio was to keep him in the dark, then wait for him to travel abroad so that they could arrest him in another country. The agents believed that if Dr. Dionisio learned that an indictment had been returned against him in the United States, then he would make it a point not to leave the Philippines.  As part of the TRICARE investigation, the United States issued two provisional warrants for Philippine nationals.  One was arrested and then waived extradition proceedings; the other has eluded arrest and continues to conceal his whereabouts in the Philippines.

Thereafter Dr. Dionisio continued to live at the same address and work in the same clinic in metro-Manila/Mandaluyong City.  On March 9, 2008, Dr. Dionisio and family members flew to Guam for a vacation.  The United States' arrest warrant from 2004 still was in the computer, so local agents arrested and detained Dr. Dionisio.  Dr. Dionisio was transported to Madison, Wisconsin via Hawai'i, San Francisco, Oklahoma and Chicago.  On April 17, 2008, this court released Dr. Dionisio from pretrial detention.  Trial was scheduled for August 25, 2008 but subsequently was continued to October 27, 2008 at Dr. Dionisio's request so that he could more thoroughly prepare for trial.

The government asserts that it has disclosed to the defense team all of the documents in the WPS files regarding claims that allegedly involve kickbacks, including notes generated by Dr. Dionisio and his clinic regarding the patient's medical treatment, the cost of that treatment and any other supporting documents.  By definition, these documents would have been prepared by Dr. Dionisio or his employees.

Dr. Dionisio states that due to the passage of time and the loss of records, it will be difficult or impossible for him to present his own documentation regarding the allegedly fraudulent claims.  Dr. Dionisio states that he does not have current records for, and does not know the whereabouts of, many former patients referenced in the government's discovery materials.  Dr. Dionisio states that he cannot recall the details of the medical care he provided to each of the patients listed in the 700+ claims identified by the government in its disclosures; some of the patients he does not even recall.

## ANALYSIS

### Dkt. 14: Pre-Indictment Delay

The time line set forth above shows that the government concluded its active investigation of Dr. Dionisio in August 2001, then took until February 2004 to indict him.  The conduct alleged in the indictment occurred between February 1999 and December 2000.  Dr. Dionisio argues that he has been prejudiced by the 3+ year delay between the last charged overt act (on December 19, 2000) and the return of the indictment.  *See* dkt. 32.

Because the statute of limitations is a defendant's primary protection against stale criminal charges, dismissal because of pre-indictment delay is available only upon a showing that

8

the delay substantially prejudiced his right to a fair trial and that the government intentionally delayed indictment in order to gain a tactical advantage over the defendant. *United States v. Marion*, 404 U.S. 307, 324 (1971); *United States v. Lovasco*, 431 U.S. 783, 790 (1977); *United States v. Sowa*, 34 F.3d 447, 450 (7th Cir. 1994). It is the defendant's burden to establish substantial prejudice with specific, concrete allegations supported by the evidence; if he clears this "monumental hurdle," then the burden shifts to the government to explain adequately the reasons for any delay. *Sowa*, 34 F.3d at 450-451. The defendant's burden to show actual and substantial prejudice is an exacting one that is not satisfied with allegations of speculative harm. *United States v. McMutuary*, 217 F.3d 477, 482 (7th Cir. 2000).

Dr. Dionisio's ability to prove prejudicial pre-indictment delay is hampered by an unusual handicap: the delay after indictment but before trial (about 57 months) is longer than the delay between the last charged act and the return of the indictment (about 38 months). There is no principled way that Dr. Dionisio can segregate and prove the prejudice arising from pre-indictment delay separate from any post-indictment delay. If this case had been tried in 2004, then witnesses and records would have been more available.[3] It is unlikely that Dr. Dionisio would have filed this particular motion if he had been brought before the court four years ago.

That said, it may be that Dr. Dionisio saw little choice but to claim pre-indictment delay in an attempt to capture the *gestalt* of the nine years that have elapsed between the charged events and his trial. This is because the drill is for courts separately to analyze pre-indictment

---

[3]   For instance, the flooding in Manila that he alleges destroyed many of his clinic's records occurred after he was indicted but before he was arrested. *See* Defendant's July 3, 2008 affidavit, dkt. 20, at ¶ 17.

delay under *Marion* and *Lovasco*, then to analyze post-indictment/pretrial delay under *Barker v. Wingo*, 407 U.S. 514 (1972) and *Doggett v. United States*, 505 U.S. 647 (1992), *see infra*. As noted above, this divides the delay in this case into a 40/60 split that could take the edge off of Dr. Dionisio's main point: it's unfair to try him in 2008 for conduct that allegedly occurred in 1999 and 2000. In a variation of Zeno's paradox, if the analysis breaks the whole into smaller pieces and analyzes them in isolation, then the analysis likely will miss the reality of what actually has occurred. *Cf. United States v. Caldwell*, 423 F.3d 754, 760 (7th Cir. 2005)(court does not accept defendant's "divide and conquer" challenge to a search warrant). There is no way to address this concern in a straight-up *Marion/Lovasco* analysis; it might be more susceptible to a *Barker/Doggett* analysis. Which segues to Dr. Dionisio's second motion to dismiss:

## Dkt. 13: Motion To Dismiss Due to Pretrial Delay

Pointing to the time line of events leading to his scheduled trial in this case, Dr. Dionisio argues for dismissal of the indictment against him. *See* Brief in Support, dkt. 32, and Reply Brief, dkt. 48. Dionisio contends that the government has violated his Sixth Amendment right to a speedy trial, citing *Barker v. Wingo*, 407 U.S. 514 (1972) and *Doggett v. United States*, 505 U.S. 647 (1992).[4]

---

[4] The Court of Appeals for the Seventh Circuit recently heard oral argument in *United States v. Wanigasinghe*, App. Case No.08-1426, a case arising out of this district involving a foreign national's motion to dismiss the indictment against him on grounds very similar to those raised by Dr. Dionisio in the instant case. It is unlikely the court will issue an opinion in time for it to be used in this court. Much of the case law exegesis that follows is cribbed from my June 29, 2007 report and recommendation in *Wanigasinghe,* 95-CR-73-C.

Other circuit courts have undertaken *Barker/Doggett* analyses. *See United States v. Mendoza*, 530 F.3d 758 (9th Cir. 2008) *United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006); *United States v. Ingram*, 446

In *Barker*, the Court held that courts reviewing speedy trial claims were to review: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant.  Absent a delay that could be deemed presumptively prejudicial, courts did not need to inquire into the other facts.  *Id*. at 530.  In determining whether a delay is presumptively prejudicial, a court must look at the "peculiar circumstances of the case." *Id*.

Generally, the extent of any prejudice to the defendant caused by a delay is determined by looking at: (1) preventing oppressive pretrial incarceration; (2) minimizing the defendant's anxiety and concern; and (3) the possibility of impairing the accused's ability fully to defend himself. *Id*. at 532.  This third concern is the most important because a defendant's inability adequately to prepare his case skews the fairness of the entire system.  *Id.*  But the Court cautioned that these four factors have no talismanic power; they are to be considered in conjunction with other relevant factors as part of a "difficult and sensitive balancing process." *Id*. at 533.

The Court picked up this thread in *Doggett*, 505 U.S. 647, noting that impairment of a defendant's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony rarely can be shown.  *Id*. at 655.  Obviously, the factors are weighed differently when dealing with a defendant who is not incarcerated and arguably unaware that he even faces charges.  As the Court acknowledged in *Doggett*, excessive

_____

F.3d 1332 (11th Cir. 2006); *RaShad v. Walsh*, 300 F.3d 27 (1st Cir. 2002); *Wilson v. Mitchell*, 250 F.3d 388 (6th Cir. 2001); *United States v. Brown*, 169 F.3d 344 (6th Cir. 1999).  None of these cases presents sufficiently analogous facts or insights into *Barker* or *Doggett* to merit discussion.  Each court seems to apply the relevant factors in a defensible but subjective fashion to support its decision to grant or deny dismissal.

delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify. *Id.* at 656. Delays of more than one year between indictment and trial are generally presumed to be prejudicial. *Id*. at 652, n.1; *United States v. Oriedo*, 498 F.3d 593, 597 (7th Cir. 2007).[5] As the Court noted in a subsequent case, *"Barker v. Wingo* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." *Moore v. Arizona*, 414 U.S. 25, 26 (1973).[6] Even so, "such presumptive prejudice cannot, by itself, carry a Sixth Amendment claim without regard to the other *Barker* criteria." Rather, presumptive delay is part of the mix of relevant facts and its importance increases with the length of delay. *Doggett,* 505 U.S. at 656.

This segued to the Court's consideration of how to factor the government's diligence into the mix. At one extreme, if the delay was caused by the government's need to track down a defendant who had gone into hiding and the government pursued him with reasonable diligence, then that defendant's speedy trial claim upon apprehension almost certainly would fail. At the other extreme, if the government intentionally held back its prosecution in order to gain some impermissible tactical advantage over a defendant, then the government's bad faith would present an overwhelming case for dismissal. Between these extremes is government negligence, which "still falls on the wrong side of the divide between acceptable and unacceptable reasons

---

[5] The defendant in *Oriedo* was arrested promptly following his indictment for crack trafficking, then was detained for 35 months before being tried. During this time the government superseded the indictment four times and the defendants received 20 continuances, many due to Oriedo's need to replace his attorney twice. 498 F.3d at 597-98. The court deemed the defendant responsible for much of the delay and found no Sixth Amendment violation. *Id.* at 601.

[6] *Moore* involved an incarcerated defendant whom the state declined to bring to trial in a timely fashion. *Id*. at 25.

12

for delaying a criminal prosecution once it has begun." The prejudice presumed from government negligence compounds over time as the presumption of evidentiary prejudice grows. *Doggett v. United States*, 505 U.S. at 656-57.

This is as good a place as any to note the alarm sounded by the dissent in *Doggett:*

> Today's opinion . . .will transform the courts of the land into boards of law enforcement supervision. For the Court compels dismissal of the charges against Doggett not because he was harmed in any way by the delay between his indictment and arrest, but simply because the Government's efforts to catch him are found wanting. . . . Our function, however is not to slap the government on the wrist for sloppy work or misplaced priorities, but to protect the legal rights of those individuals harmed thereby. By divorcing the Speedy Trial Clause from all considerations of prejudice to an accused, the Court positively invites the Nation's judges to indulge in ad hoc and result-driven second guessing of the government's investigatory efforts. Our Constitution neither contemplates nor tolerates such a role.

505 U.S. at 670-71 (Thomas and Scalia, JJ., and Rehnquist, C.J., dissenting).

But the Court's actual opinion in *Doggett* held otherwise: there is an inverse relationship between the amount of prejudice a defendant must establish and the length of the delay in trying him. One logically could infer that at least on some level, the Court's decision rests on the doctrine of repose, but despite asking the parties to brief this point in *Doggett*, the Court did not address it. *See* 505 U.S. at 660 & 660 n.1 (Thomas and Scalia, JJ., and Rehnquist, C.J., dissenting). *Doggett* seems to hold that there is a point on the graph where the post-indictment delay is so long that the presumption of prejudice becomes irrebuttable. The location of that point is influenced by other salient factors, and, apparently, by the trial court's subjective notion as to how long is too long.

Against this backdrop, I address the four *Barker* factors:

13

(1) **Length of delay:**  Dr. Dionisio was indicted on February 19, 2004.  He first appeared in this court with counsel on April 7, 2008 and originally was set for trial on August 25, 2008.  This is a delay of 4½ years.  Under *Doggett,* such a delay is presumptive prejudicial. Further, as noted in the previous section, this case presents circumstances in which the court should not completely ignore the pre-indictment delay.  The indictment was returned four years and 51 weeks after the oldest overt act alleged as part of the conspiracy, even though the active phase of Dr. Dionisio's investigation had ended about 2½ years earlier, in August 2001. Certainly the government was entitled to prepare this case for indictment between August 2001 and February, 2004 and the TRICARE team indisputably was very busy, but where we have landed is a trial date 9½ years after the oldest charged conduct.  Without getting tangled in the myriad ways to configure the weeks, months and years that have passed, suffice it to say that the 4½ years between the 2004 indictment and the 2008 trial date does not by itself adequately capture the length of the delay that occurred in this case.

(2) **Reason for the delay:**  The delay was a result of the government's tactical decision not to seek extradition.  In opposition to Dr. Dionisio's motion to dismiss, the government contends that it had "correctly, and most importantly in good faith, perceived that the extradition of Dionisio would be futile."  Dkt. 41 at 6.  I do not doubt the government's good faith, but as the years passed, one has to question whether its decision to do nothing other than sit and wait remained correct.  As the dissent predicted in *Doggett*, this court's review of the government's decision virtually forces the court to second-guess the government's capture plan.

14

The official position of the United States, through its Department of State, always has been that the extradition treaty with the Philippines works.  This significantly undermines the strength of the government's futility argument.  Obviously, it would be a different story if in or around 2004, the State Department were to have concluded and announced that it was futile for the United States to attempt the extradition of Philippine nationals.  It's not pollyannaish for the court to expect the State Department publicly to disparage the efficacy of a treaty, because it's happened before in similar circumstances. *See, e.g., United States v. Corona-Verbera*, 509 F.3d 1105, 1114-15 (9th Cir. 2007).  In 1995, the government indicted Corona-Verbera, a Mexican citizen living in Mexico, for trafficking prodigious quantities of powder cocaine through the notorious "Douglas Tunnel" under the international border.  The government promptly went public with its desire to arrest Corona-Verbera, including multiple contemporaneous television reports on "America's Most Wanted" and "Unsolved Mysteries." However, the government did not attempt to extradite Corona-Verbera from Mexico until 2002 because it believed that in the 1990s, Mexico was not honoring its treaty obligations to produce its citizens for trial in the United States.  A State Department witness corroborated this belief to the trial court, testifying that from the 1980s through about 1998, Mexico did not honor any U.S. extradition requests. A very small trickle of extraditions began in 1998, prompting the United States eventually to file a provisional warrant for Corona-Verberra.  509 F.3d at 1115. In 2003, Mexico honored the warrant and produced Corona-Verbera to the United States.  The federal courts brushed aside Corona-Verbera's *Barker/Doggett* claim of prejudicial delay, finding that the government had exercised due diligence:

15

> Substantial evidence supports the government's assertion that extradition from Mexico on drug related charges prior to 2002 was extremely rare.  The futility of extradition, combined with the government's entry of Corona-Verbera into NCIC and border stop computers, and the airing of the Most Wanted and Unsolved Mysteries segments, indicate that the government did not simply forget about Corona-Verbera.  Rather, after extradition became more likely in 2002, the government obtained an arrest warrant and diligently sought extradition.

509 F.3d at 115-16.

The TRICARE fraud team's approach in the instant case has some surface similarities to *Corona-Verbera*, but there are important differences.  Although the government has provided resource materials that acknowledge official corruption and kinship favoritism as society-wide problems in the Philippines,[7] the government has not adduced any evidence linking these concerns to extradition.  To the contrary, the State Department's report states that U.S.-Philippine law enforcement cooperation "has reached new levels: U.S. and Philippine agencies have cooperated to bring charges against numerous terrorists, to implement the countries' extradition treaty, and to train thousands of Filipino law enforcement officers."  Gov. Exh. 1 at 11.  As noted in the fact section, the official word from the U.S. government is that the treaty works.  It does not appear that the TRICARE fraud team consulted with the State Department; it is not even clear whether the team checked with the Department of Justice to get the contemporaneous input and recommendation of DOJ's Office of International Affairs.  (If it did, then the government promptly should provide this information to the court so that it can be factored into the court's final analysis.)

---

[7] *see* Gov. Exh. 1, the State Department's own background note on the Philippines and Gov. Exh. 2, "Graft and Corruption: the Philippine Experience," an undated monograph.

On this factual record, the TRICARE fraud team eschewed the extradition treaty at its peril. This is not to say that they were required from the get-go to employ diplomatic channels that the team was convinced were impotent and counterproductive. This court has sufficient hands-on professional experience dealing with cronyism and corruption to understand and sympathize with the agents' concerns. It was legitimate for the team to fear that if it issued a provisional warrant for Dr. Dionisio, then the Philippine government was unlikely to produce him any time soon, and thereafter Dr. Dionisio would not travel abroad. Therefore, decision to seal Dr. Dionisio's indictment and warrant probably was, at first, the tactic most likely to succeed. If Dr. Dionisio had flown to Guam in March 2004, then he would have had no basis to complain about the method in which the United States government had seized him, at least none that this court would find compelling.

But *Doggett* suggests that this wait-and-ambush strategy had a one-year shelf life. By March 2005, the government had incubated presumptive prejudice against Dr. Dionisio. In the absence of a better backup plan, it was time for the USAO to issue the provisional warrant. Either Philippine government would honor it or not, but this act would have demonstrated good faith and due diligence sufficient to toll the Sixth Amendment clock. *See United States v. Walton*, 814 F.2d 376, 379 (7th Cir. 1987). But the government continued to wait, through March 2006, 2007 and 2008, during which time it did . . . nothing. As the years piled up like stones on Giles Corey, it became all the more pressing for the government to do *something*.

But I surmise that there were no quarterly constitutional ticklers in the Dionisio file alerting the government that its ability to try Dr. Dionisio was evanescing. On one level this is understandable: having locked in its own evidence and having beaten the statute of limitations

(by seven days), apparently the government was willing to wait indefinitely for Dr. Dionisio to venture from his homeland.  Given the clear mandates of *Barker* and *Doggett,* and absent any persuasive official endorsement of the decision to bypass the extradition treaty, after one year the government's tactical inaction was ill-advised and inappropriate.

Although this was an intentional choice, it would be unfair to characterize it as an intent to prejudice Dr. Dionisio.  The TRICARE fraud team was prepared in 2004 to go toe-to-toe in court with Dr. Dionisio.  But after a year, this tactic of waiting passively while eschewing an extradition treaty endorsed as effective by the State Department began to look reckless. The government's sealed warrant strategy was reasonable for one year.  Given the all-or-nothing risk posed by issuing a provisional warrant, the government faced a genuine dilemma to which this court is sympathetic.  But there is a constitutional imperative in the mix that the government disregarded at its peril.

**(3) Dr. Dionisio's assertion of his right to a speedy trial:**  By government design, Dr. Dionisio was unaware of the indictment against him until he was arrested in Guam four years later.  Perforce, Dr. Dionisio could not have learned of the charges or sought earlier resolution of them.  The government's attempt in its brief to impute knowledge to Dr. Dionisio following the agents' interview contradicts the government's entire rationale for maintaining his indictment under seal.  After all, if the government genuinely believed that Dr. Dionisio "was aware that the government may be charging him with a serious fraud," dkt. 41 at 9, then the cat was out of the bag in 2001 and there would have been no reason not to issue a provisional warrant and to request his extradition.

18

After we set the schedule in this case, Dr. Dionisio asked for an extension of the trial date.  This tolled the speedy trial clock for the following two months, from August 2008 to October 2008.  This request for more time to review the government's evidence and prepare a defense does not erase the years of delay between indictment and arrest.

**(4) Prejudice to Dr. Dionisio:** As noted above, there is presumptive prejudice, but this presumption, standing alone, probably is not grounds to dismiss the indictment.  The operative question is whether Dr. Dionisio's defense has been impaired by dimming memories and the loss of exculpatory evidence.

Dr. Dionisio has claimed, without contradiction from the government, that his clinic routinely destroys its medical and financial records after five years.  Therefore, all of Dr. Dionisio's records of the events charged in the indictment would have been purged prior to his arrest in 2008.  Any records that survived routine destruction might have been destroyed by subsequent floods at the clinic.  According to Dr. Dionisio, these records would have corroborated his current claim that there were no ghost patients and that the clinic paid no kickbacks or refunds to any of the TRICARE patients.  Similarly, Dr. Dionisio claims that his memory has dimmed, so that he cannot recall the details of the medical care he provided to each of the patients listed in the 890 claims flagged by the government (which must be a different list from the 700+ claims shown to Dr. Dionisio in 2001).  Dr. Dionisio further claims that he cannot even remember all of these patients; some of the rest he will be unable readily to locate, hampering his ability to obtain their version of the events at issue (if they remember).

19

The government responds that Dr. Dionisio's claimed concerns are overblown because all of the documents he submitted in support of the flagged claims have been provided to him by the government, he confessed, and he marked up the list of 700 claims presented to him in his August 2001 interview with the agents.  This response is partially true but too one-sided a proposition to accept at face value.  The agents' report of their August 21, 2001 interview with Dr. Dionisio is a strong piece of inculpatory evidence.  That said, the report is just their side of the story.  Dr. Dionisio may have a different recollection of what he actually said and what he actually meant.  Because the agents did not record the interview, the participants will be testifying from memory.  In seven years, those memories have faded and the clinic's medical records have been purged, thereby potentially undermining Dr. Dionisio's ability to testify persuasively, with corroboration, as to a less damning version of what got said.

This is not a finding that the agents' report is incorrect or incomplete; for all I know, it is thorough and spot-on.  But in an adversarial system where criminal defendants are presumed innocent, everyone must withhold judgment until the jury has heard and seen all the evidence.  If the passage of time has compromised a defendant's ability adequately to present to the jury his more innocuous version of the interview, then we have actual prejudice.  This seems to be the heart of the Court's decision, in *Doggett*, to presume prejudice after a year.  There will be cases where this presumption is rebutted;[8] this, however, is not one of those cases.  The interview is material, disputed, seven years past, and unrecorded.

---

[8]  For instance, in *United States v. Wanigasinghe*, this court found that defendant's ability to defend against the allegations of bank fraud had not been prejudiced by the passage of time because this was a paradigmatic paper case.  *See* Nov. 2, 2007 order, dkt. 44, at 13.

20

As for the paperwork: it might be, as the government asserts, that all the documents kept by WPS and disclosed to Dr. Dionisio during discovery present a clear and complete record of what occurred. Then again, it might not. Perhaps the clinic had other notes, charts or records that could have fleshed out a particular claim in a manner relevant to the jury's determination. Dr. Dionisio implies that this used to be true, but he has not provided any specific examples–either by category of document or by individual claim–of what he used to have in the clinic files that would have been helpful to him but now is gone. Dr. Dionisio also claims that he has lost his business and bank records which would "readily show that no kickbacks or refunds were ever paid by the clinic to any of the TRICARE patients." Brief in support, dkt. 32, at 11. Dr. Dionisio claims that because he no longer has his records, it will be difficult for him to locate all of the patients whose insurance claims underlie the charges. Although this is only a partial defense to the government's charges–for instance, not every claim is alleged to be fraudulent and some of the alleged kickbacks went from the patient back to the clinic–I cannot conclude that Dr. Dionisio has suffered no prejudice at all from the loss of his medical and business records over time. This is not an archetypal "paper case" like *Wanigasinghe*. This court cannot rule out the possibility that Dr. Dionisio's sworn proffer is accurate, and it cannot endorse the government's position that these missing documents could not possibly be relevant to the defense.

## CONCLUSION

This court is keenly aware that "overzealous application of this remedy would infringe the societal interest in trying people accused of crime, rather than granting them immunization

because of legal error." *Barker*, 407 U.S. at 522, n.16.  This court has no wish to sit as a board of law enforcement supervision that second-guesses the government's investigatory efforts then slaps the government on the wrist for sloppy work or misplaced priorities. *Doggett*, 505 U.S. at 670-71 (Thomas and Scalia, JJ., and Rehnquist, C.J., dissenting).  But Dr. Dionisio, having been indicted on felony fraud charges in the United States, has a Sixth Amendment right to a speedy trial and it is this court's job to ensure that the government does not violate that right.  A presumptively prejudicial amount of time has passed since the indictment was returned in 2004, and this investigation lay fallow for several years prior to that.  The government cannot deny that it waited a long, long time, but it contends that the delay was justified because to seek extradition was to guarantee failure.

This *could* be true, but the government has not mustered sufficient facts to show that it *is* true.  Absent proof that the State Department–or perhaps even the Department of Justice–knew about and endorsed the TRICARE fraud team's refusal to use America's extradition treaty with the Philippines, then this could should not accept this excuse for a delay lasting more than one year when this delay appears actually to have prejudiced the defense.  There was nothing wrong with the team's original plan:  sometimes craftiness is more likely to succeed than boldness.  But when a year passed with no results, Sixth Amendment concerns should have prompted the team to modify its tactics.  This never happened and that was a critical error.  Dr. Dionisio was oblivious to his indictment until almost eight years after his initial encounter with the agents and after all of his own records had been purged or destroyed.  On these facts, the government cannot rebut the presumption of prejudice.  On this record, it appears that Dr. Dionisio is entitled to dismissal of the indictment as a result of the government's pretrial delay.

22

## RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court grant defendant Diogenes Dionisio's motion to dismiss the indictment due to pretrial delay and deny his motion to dismiss based on pre-indictment delay.

Entered this 6th day of October, 2008.

BY THE COURT:
/s/
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin  53701

Chambers of                                                                                          Telephone
STEPHEN L. CROCKER                                                                      (608) 264-5153
U.S. Magistrate Judge

October 6, 2008

Peter Mark Jarosz
United States Attorney's Office
660 West Washington Avenue, #303
Madison, WI 53703

Charles W. Giesen
Giesen Law Offices, S.C.
14 S. Broom Street
P.O. Box 909
Madison, WI 53701-0909

Renecio Rellora Espiritu
Espiritu Vitales Espiritu Law Office (EVELO)
Block 4, Lot 1, Abraham St., Sta. Lucia Bliss Townhomes,
Brgy. Sta. Lucia, Pasig City
Pasig City, RP 01608

         Re:___U.S. v. Diogenes Dionisio; 04-cr-30-bbc

Dear Counsel:

         The attached Report and Recommendation has been filed with the court by the
United States Magistrate Judge.

         The court will delay consideration of the Report in order to give the parties an
opportunity to comment on the magistrate judge's recommendations.

         In accordance with the provisions set forth in the memorandum of the Clerk of Court
for this district which is also enclosed, objections to any portion of the report may be raised
by either party on or before October 16, 2008, by filing a memorandum with the court with
a copy to opposing counsel.

24

If no memorandum is received by October 16, 2008, the court will proceed to consider the magistrate judge's Report and Recommendation.

Sincerely,


/s/ S. Vogel for


Connie A. Korth
Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge

MEMORANDUM REGARDING REPORTS AND RECOMMENDATIONS

Pursuant to 28 U.S.C. § 636(b), the district judges of this court have designated the  full-time magistrate judge to submit to them proposed findings of fact and recommendations for disposition by the district judges of motions seeking:

(1) injunctive relief;

(2) judgment on the pleadings;

(3) summary judgment;

(4) to dismiss or quash an indictment or information;

(5) to suppress evidence in a criminal case;

(6) to dismiss or to permit maintenance of a class action;

(7) to dismiss for failure to state a claim upon which relief can be granted;

(8) to dismiss actions involuntarily; and

(9) applications for post-trial relief made by individuals convicted of criminal offenses.

Pursuant to § 636(b)(1)(B) and (C), the magistrate judge will conduct any necessary hearings and will file and serve a report and recommendation setting forth his proposed findings of fact and recommended disposition of each motion.

Any party may object to the magistrate judge's findings of fact and recommended disposition by filing and serving written objections not later than the date specified by the court

in the report and recommendation. Any written objection must identify specifically all proposed findings of fact and all proposed conclusions of law to which the party objects and must set forth with particularity the bases for these objections. An objecting party shall serve and file a copy of the transcript of those portions of any evidentiary hearing relevant to the proposed findings or conclusions to which that party is objection. Upon a party's showing of good cause, the district judge or magistrate judge may extend the deadline for filing and serving objections.

After the time to object has passed, the clerk of court shall transmit to the district judge the magistrate judge's report and recommendation along with any objections to it.

The district judge shall review de novo those portions of the report and recommendation to which a party objects. The district judge, in his or her discretion, may review portions of the report and recommendation to which there is no objection. The district judge may accept, reject or modify, in whole or in part, the magistrate judge's proposed findings and conclusions. The district judge, in his or her discretion, may conduct a hearing, receive additional evidence, recall witnesses, recommit the matter to the magistrate judge, or make a determination based on the record developed before the magistrate judge.

**NOTE WELL: A party's failure to file timely, specific objections to the magistrate's proposed findings of fact and conclusions of law constitutes waiver of**

that party's right to appeal to the United States Court of Appeals.  *See United States v. Hall,* 462 F.3d 684, 688 (7th Cir. 2006).